[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-15587
_____

D.C. Docket No. 1:10-cv-02975-AT

SOUTHERN COMMUNICATIONS SERVICES, INC.,
d.b.a. Southernlinc Wireless,

Plaintiff - Appellant,

versus

DEREK THOMAS,
individually and on behalf of others similarly situated,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(July 12, 2013)

Before TJOFLAT, CARNES, and JORDAN, Circuit Judges.


TJOFLAT, Circuit Judge:

Southern Communications Services, Inc., (d/b/a SouthernLINC Wireless) ("SouthernLINC") appeals the District Court's November 3, 2011, order denying its motion to vacate two arbitration awards, one construing the arbitration clause so as to allow for class litigation, the other certifying a class. We conclude that, under the standard set forth by the Supreme Court in <u>Oxford Health Plans LLC v. Sutter</u>, 569 U.S. ___, 133 S. Ct. 2064, ___ L.Ed.2d ___ (2013), the arbitrator did not "exceed[] [his] powers" under § 10(a)(4) of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 <u>et seq.</u> (2006), either in construing the arbitration clause as he did or in certifying a class.

In Part I, we lay out the facts and procedural history of the dispute between SouthernLINC and its former wireless customer, Derek Thomas. In Part II, we find that, in reaching the decisions he did, the arbitrator was "'arguably construing . . . the contract,'" <u>Sutter</u>, 569 U.S. at ___, 133 S. Ct. at 2068 (quoting <u>E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17</u>, 531 U.S. 57, 60, 121 S. Ct. 462, 466, 148 L. Ed. 2d 354 (2000)), and that we thus "may not correct his mistakes under § 10(a)(4)," <u>id.</u> at ___, 133 S. Ct. at 2070. We briefly close in Part III.

I.

A.

SouthernLINC is a wireless provider in the southeastern United States headquartered in Atlanta, Georgia.  A subsidiary of Southern Company, which owns a number of major electric utility companies in the same region, SouthernLINC was formed in the mid-1990s to run a wireless network that would serve its parent company's operations.  The company uses excess capacity on the network to provide commercial mobile telephone services to customers.

During the relevant period, SouthernLINC required that each customer sign a standard contract, which included a set of Terms and Conditions.[1]  One provision therein, titled "Term/Termination," set forth the charge that a customer would incur in the event he or she terminated a contract early:

> If you terminate this Agreement or if we terminate this Agreement for cause prior to the end of the Initial Term, then you will pay an Early Termination Fee(s) (ETF) of $200.00 per handset or as otherwise set forth on the web site order page and any other charges owing under this Agreement within 10 days of the payment due date of your billing statement.

---

[1] For the sake of accuracy, we make clear that not all plans offered by SouthernLINC are subject to early termination fees.  While "affiliate customers" and government entities are not subject to such fees, "[m]edium business, small business, and consumer customers all sign identical Terms and Conditions containing the ETF provision."  Record, no. 1-6, at 8.

3

Record, no. 1-4, at 19–20.  The contract also contained a provision on arbitration, which, in its entirety, reads:

> The parties will make good faith attempts to resolve any disputes. If the parties cannot resolve the dispute within 60 days after the matter is submitted to them, then, unless otherwise agreed, the parties will submit the dispute to arbitration. The parties will request that arbitrator(s) hold a hearing within 60 days following their designation, and render a final and binding resolution within 30 days after the hearing.  The parties will conduct the arbitration in Atlanta, Georgia pursuant to applicable Wireless Industry Arbitration Rules of the American Arbitration Association.

Id. at 22–23.  The arbitration provision contained no reference to class arbitration.

Derek Thomas became a customer of SouthernLINC on June 7, 2005, when he contracted to begin his first line of service.  He added a second line of service for his wife on October 23, 2006, and a final line for his son on September 10, 2007.  Thomas agreed to SouthernLINC's terms and conditions with each added line.

After contracting to add his third line, on February 20, 2008, Thomas canceled his son's line of service.  He was charged an ETF, but SouthernLINC promptly waived the charge when he protested the fee.  Two days later, Thomas canceled his wife's line of service.  Thomas paid his wife's cancelation fee.[2]  One month later, on March 25, 2008, Thomas terminated his final line of service.

---

[2]  SouthernLINC applied an $85.96 "offset credit" to Thomas's account at this point, bringing Thomas's actual payment down to $114.04.

4

SouthernLINC charged a $200 ETF.  When Thomas did not pay the bill, he

received a $250 bill from a collections agency.  Thomas disputed the bill by

returning it, unpaid, to the agency with a note.  He heard nothing further from the

agency and has not seen any impact of the unpaid bill on his credit report.  Thomas

has no intention to become a SouthernLINC subscriber in the future.

### B.

On July 31, 2008, Thomas filed "on behalf of himself and a nationwide class

of consumers" a demand for arbitration with the American Arbitration Association

("AAA").  Record, no. 1-4, at 2.  Among other things, he argued that

SouthernLINC's termination fees were unlawful penalties under Georgia law, see

O.C.G.A. § 13-6-7, and unjust, unreasonable, and unlawful charges under the

Federal Communications Act, 47 U.S.C. § 201(b) (2006).  He sought from the

arbitrator a declaration that the fees he paid were unlawful; an injunction on behalf

of the class (Thomas having no intention to become a SouthernLINC customer

again) to prevent SouthernLINC from engaging in deceptive, unjust, and

unreasonable practices; statutory, consequential, and incidental damages;

disgorgement of all termination fees; additional appropriate declaratory relief; and

interest.

On November 24, SouthernLINC counterclaimed for breach of contract,

seeking compensatory, incidental, and consequential damages; interest; and

attorneys' fees and costs.  That same day, Thomas moved, pursuant to Rule 3 of

the AAA's Supplementary Rules for Class Arbitrations, for a Clause Construction

Award to allow class action treatment.  On April 2, 2009, the appointed arbitrator

issued a Partial Final Clause Construction Award.  He found that the arbitration

clause at hand permitted arbitration to proceed on behalf of a class because 1)

under Georgia law, because the arbitration clause did not expressly bar class

treatment, such treatment was permitted; 2) Georgia law, as set out by this circuit

in Dale v. Comcast Corp., 498 F.3d 1216 (11th Cir. 2007), "permit[s]—and even

favor[s]—[class action] when individual class member[s'] claims are meager" so

that they might vindicate their rights; and 3) class action presents an efficient

mechanism for dispute resolution.  Record, no. 1-2, at 6–8.

On November 20, 2009, Thomas moved for class certification.  The

arbitrator certified the class on June 24, 2010, in a Partial Final Class

Determination Award that found that the proposed class fulfilled state and federal

requirements for class certification:[3] commonality, typicality, adequacy of class

---

[3]  The arbitrator reasoned that Supplementary Rule 4(a) of the American Arbitration
Association's Supplementary Rules for Class Arbitrations (the "Supplementary Rules"), in
instructing that "the arbitrator shall consider the criteria enumerated in this Rule 4 and any law or
agreement of the parties the arbitrator determines applies to the arbitration," Supplementary Rule
4(a), freed him to consider federal class action authority and Georgia class action cases, the
primary sources to which the parties turned for support.

representative, predominance, and superiority.[4]  Immediately thereafter, on July 2,

2010, SouthernLINC moved for reconsideration of the Clause Construction Award

based on the Supreme Court's April 2010 decision in Stolt-Nielsen S.A. v.

Animalfeeds Int'l Corp., 559 U.S. 662, 130 S. Ct. 1758, 176 L. Ed. 2d 605 (2010).

Upon reconsideration of his award, the arbitrator determined that, although his first

and third grounds for finding class treatment permissible under the arbitration

clause were "improper" under Stolt-Nielsen, his second ground "satisfied the

rigorous requirements set forth in Stolt-Nielsen," for, by relying on Eleventh

Circuit interpretation of Georgia law to reach the conclusion that Georgia law

favored class treatment where the amount in controversy was very small so that

parties might "vindicate their rights," he "based the Clause Award on a rule of law

or rule of decision as Stolt-Nielsen requires."  Record, no. 7-4, at 6.

On September 17, 2010, SouthernLINC petitioned the District Court for the

Northern District of Georgia[5] under 9 U.S.C. § 10(a)(4) to vacate the Clause

Construction and Class Determination Awards.  In declining to do so, the court

cited White Springs Agric. Chems., Inc. v. Glawson Invs. Corp. for the proposition

---

[4]  The arbitrator noted that "[t]hree of the eight class certification tests—numerosity, adequacy of counsel, and substantially similar arbitration clause—are not disputed by [SouthernLINC]."  Record, no. 1-3, at 7.

[5]  The District Court had jurisdiction under 28 U.S.C. § 1331 (2006) and 28 U.S.C. § 1332.

7

that an arbitrator's "incorrect legal conclusion is not grounds for vacating or

modifying [an] award," 660 F.3d 1277, 1280 (11th Cir. 2011), and Frazier v.

CitiFinancial Corp., 604 F.3d 1313, 1324 (11th Cir. 2010), for the proposition that

a district court has no jurisdiction to vacate an award even in the event of an

arbitrator's manifest disregard of the law.  The court found "[t]he arbitrator in the

present case engaged in the exact analysis Stolt-Nielsen requires."  Southern

Commc'n Servs., Inc. v. Thomas, 829 F. Supp. 2d 1324, 1339 (N.D. Ga. 2011).

He "identified generally applicable contract law principles to determine whether

the parties implicitly authorized class arbitration. . . .  [H]e identified legal

principles governing the situation: state law governing contract formation and

interpretation."   Id.

     While the present case was before us, the Supreme Court in Sutter, 569 U.S.

at ___, 133 S. Ct. at 2068, set about to resolve a circuit split by answering the

question of whether an arbitrator acts within his powers or exceeds his powers

under the FAA by determining that parties affirmatively "agreed to authorize class

arbitration," Stolt-Nielsen, 559 U.S. at ___, 130 S. Ct. at 1776, based solely on

their use of broad contractual language precluding litigation and requiring

arbitration of any dispute arising under their contract.  Because the resolution of

that question is dispositive of the present case, we stayed the case until the

Supreme Court could reach its decision.

8

II.

A.

Congress enacted the Federal Arbitration Act, 9 U.S.C. § 10(a)(4), to supplant the judiciary's distaste for arbitration with a "national policy favoring [it] and plac[ing] arbitration agreements on equal footing with all other contracts." Hall Street Assoc., LLC v. Mattel, Inc., 552 U.S. 576, 581, 128 S. Ct. 1396, 1402, 170 L. Ed. 2d 254 (2008) (quoting Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443, 126 S. Ct. 1204, 163 L. Ed. 2d 1038 (2006)) (changes in original). As such, the statute instructs that a district court "must grant such an order [confirming an award] unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9 (emphasis added). Sections 10 and 11 proceed to lay out the exceedingly narrow grounds upon which an award can be vacated, modified, or corrected. Section 11, irrelevant to our present purposes, allows for modification or correction in the event of such things as miscalculation of figures and mistakes as to description. Section 10(a), upon which we focus, provides four grounds for vacatur:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S. C. § 10.  These sections together give "substan[ce to] a national policy favoring arbitration with just the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway."  Hall Street, 552 U.S. at 588, 128 S. Ct. at 1405.

The Supreme Court in Hall Street held that "§§ 10 and 11 respectively provide the FAA's exclusive grounds for expedited vacatur and modification."  Id. at 584, 128 S. Ct. at 1403.  In light of the Court's decision in Hall Street, we held that the "judicially-created bases for vacatur" that we had formerly recognized, such as where an arbitrator behaves in manifest disregard of the law, "are no longer valid." Frazier, 604 F.3d at 1324.  Nor is an "incorrect legal conclusion . . . grounds for vacating or modifying an award."  White Springs, 660 F.3d at 1280.

The Supreme Court reaffirmed the national policy favoring arbitration in relation to class arbitration in Sutter, 569 U.S. at ___, 133 S. Ct. at 2071.  In Sutter, a pediatrician, John Sutter, filed suit against Oxford Health Plans, a health insurance company, on behalf of himself and a proposed class of other physicians

under contract with Oxford.  Oxford moved to compel arbitration, and the parties

agreed that the arbitrator should decide whether their contract authorized class

arbitration.  Upon consideration of the arbitration clause, the arbitrator decided that

the contract, though silent as to the specific possibility of class arbitration, "on its

face . . . expresse[d] the parties' intent that class arbitration can be maintained."

Id. at ___, 133 S. Ct. at 2067.  Oxford twice moved to vacate the arbitrator's

finding, once before and once after the Supreme Court's decision in Stolt-Nielsen.

In Stolt-Nielsen, the Court had found that an arbitrator exceeded his authority

under § 10(a)(4) where, faced with a contract silent as to class arbitration and a

stipulation between the parties that "they had reached 'no agreement' on th[e]

issue," 559 U.S. at ___, 130 S. Ct. at 1775, the arbitrator reached a decision

without "identifying and applying a rule of decision derived from the FAA" or

applicable federal or state law, id. at ___, 130 S. Ct. at 1770.

  In Sutter, the Supreme Court rejected Oxford's effort to find support in

Stolt-Nielsen.  The Court noted that the "unusual stipulation that [the parties] had

never reached an agreement on class arbitration" in Stolt-Nielsen meant

necessarily that "the arbitral decision there . . . lacked any contractual basis for

ordering class procedures," Sutter, 569 U.S. at ___, 133 S. Ct. at 2069; "[s]o in

setting aside the arbitrators' decision, we found not that they had misinterpreted the

contract, but that they had abandoned their interpretive role," <u>id.</u> at ___, 133 S. Ct. at 2070.

Because the parties in <u>Sutter</u> "bargained for the arbitrator's construction of their agreement," the Court opined, "an arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits."[6] <u>Id.</u> at ___, 133 S. Ct. at 2068 (quoting <u>E. Associated Coal</u>, 531 U.S. at 62, 121 S. Ct. at 466).  Thus, "the sole question" a court should ask under the exacting standards of § 10(a)(4) "is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong." <u>Id.</u> at ___, 133 S. Ct. at 2068.

B.

---

[6] The Supreme Court noted in <u>Sutter</u> that this would not be the case

if Oxford had argued below that the availability of class arbitration is a so-called "question of arbitrability."  Those questions—which "include certain gateway matters, such as whether parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy"—are presumptively for courts to decide. . . .  [T]his Court has not yet decided whether the availability of class arbitration  is a question of arbitrability. . . .  But this case gives us no opportunity to do so because Oxford agreed that the arbitrator should determine whether its contract with Sutter authorized class procedures.

<u>Oxford Health Plans LLC v. Sutter</u>, 569 U.S. ___, 133 S. Ct. 2064, 2069 n.2 (2013) (citations omitted).  Like the Supreme Court, we also have not decided whether the availability of class arbitration is a question of arbitrability.  However, as in <u>Sutter</u>, this case does not give us the opportunity to consider the question, because here SouthernLINC gave the question of whether the contract allowed for class arbitration to the arbitrator through its choice of rules and by failing to "dispute th[e] [a]rbitrator's jurisdiction to decide this threshold issue."  Record, no. 1-2, at 3.

Despite the extraordinary deference with which arbitral decisions are treated under § 10(a)(4), SouthernLINC nonetheless argues that the arbitrator in the case at hand "exceeded his authority" under that statute in issuing the Partial Final Clause Construction Award.  It attempts to distinguish the facts of Sutter from those before us, arguing that, because there was an "absence of any textual indication of agreement to class arbitration," Appellant Letter Br. at 6, the standards laid out in Stolt-Nielsen rather than Sutter apply.  We think that SoutherLINC misinterprets the relationship between the two cases.  Sutter instructs us that, under § 10(a)(4), if "the arbitrator (even arguably) interpreted the parties' contract," a court must end its inquiry and deny a § 10(a) motion for vacatur.  Sutter, 569 U.S. at ___, 133 S. Ct. at 2068.  It is only in the rare instance where a court finds that a contract "lack[s] any contractual basis for ordering class procedures," id. at ___, 133 S. Ct. at 2069, that it must proceed to the analysis directed by Stolt-Nielsen and ask whether the arbitrator "identif[ied] and appl[ied] a rule of decision derived from the FAA" or other applicable body of law or, alternatively, merely "imposed its own policy choice and thus exceeded its powers," Stolt-Nielsen, 559 U.S. at ___, 130 S. Ct. at 1770.

Here, however, the briefest glance at the Partial Final Clause Construction Award reveals that the arbitrator in this case arguably "interpreted the parties' contract."  Sutter, 569 U.S. at ___, 133 S. Ct. at 2068.  The arbitrator began his

13

award by recounting the text of the contract's arbitration clause.  He acknowledged that the contract is "silent with respect to class actions" and went on to examine the text of AAA Supplementary Rule 3, which was incorporated by reference into the contract by the parties' choice, stated in the arbitration clause, to "conduct the arbitration . . . pursuant to applicable Wireless Industry Arbitration Rules of the American Arbitration Association."  Record, no. 1-2, at 3.  After parsing the language of that rule, the arbitrator went on to consider the meaning of the words "any disputes" in the clause itself.  Id. at 5.  He then, in a section headed "Application of Georgia Contract Construction Law," interpreted the meaning of silence as to class arbitration within the clause and determined that "it is fair to conclude that the intent [of the clause] was not to bar class arbitration."  Id. at 6.

Engaging as he did with the contract's language and the parties' intent, the arbitrator did not "stray[] from his delegated task of interpreting a contract," Sutter, 569 U.S. at ___, 133 S. Ct. at 2070, for he was "'arguably construing' the contract," id. (quoting E. Associated Coal, 531 U.S. at 62, 121 S. Ct. at 466).  It is not for us to opine on whether or not that task was done badly, for "'[i]t is the arbitrator's construction [of the contract] which was bargained for. . . .'  The arbitrator's construction holds, however good, bad, or ugly."  Id. at ___, 133 S. Ct. at 2070–71 (quoting United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 599, 80 S. Ct. 1358, 1362, 4 L. Ed. 2d 1424 (1960)).

14

C.

In addition to arguing that the arbitrator exceeded his authority in issuing the Partial Final Clause Construction Award, SouthernLINC further argues that he exceeded his authority in issuing the Partial Final Class Determination Award by "not simply err[ing] in applying the applicable law [but in] affirmatively refus[ing] to apply that law." Appellant's Br. at 19. SouthernLINC finds that the arbitrator "refus[ed] to apply [applicable] law" because he did not recognize that SouthernLINC's "voluntary payment defense, which necessarily requires a claimant-by-claimant factual analysis, makes it impossible for the putative class to satisfy the commonality, typicality and predominance requirements" of class certification. Id. at 20. SouthernLINC submits that, because the arbitrator realized that the defense would prevent the elements of class certification from being met, he "invented a new and different rule" by "decid[ing] that what he termed 'the overriding common legal question' of whether the ETF is a valid liquidated damages clause or a penalty was the real issue." Id. at 22.

We agree with the District Court that SouthernLINC's argument, at its core, is simply that the arbitrator applied the agreed-upon class certification standard erroneously. "SouthernLINC utterly fails to show how the arbitrator exceeded his power, all the while enumerating his legal errors." Southern Comm. Servs., Inc., 829 F. Supp. 2d at 1342. Given that, in our circuit, we recognize neither an

15

"incorrect legal conclusion," <u>White Springs</u>, 660 F.3d at 1280, nor a "manifest disregard of the law," <u>Frazier</u>, 604 F.3d at 1323, as grounds for vacating or modifying an award, we are left, under § 10(a)(4), with a single question: did the arbitrator "exceed [his] powers, or so imperfectly execute[] them that a mutual, final, and definite award upon the subject matter submitted was not made"?  9 U.S.C. § 10(a)(4).  The answer to that question is no.

### III.

Under the highly deferential standard of § 10(a)(4), the arbitrator did not exceed his authority in his issuance either of the clause construction award or of the class determination award.

For the forgoing reasons, the opinion of the District Court is

AFFIRMED.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

John Ley
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 12, 2013

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  11-15587-EE
Case Style:  Southern Communications Servic v. Derek Thomas
District Court Docket No:  1:10-cv-02975-AT

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the CRIMINAL JUSTICE ACT must file a CJA voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for a writ of certiorari (whichever is later).

Pursuant to Fed.R.App.P. 39, costs taxed against the appellant.

The Bill of Costs form is available on the internet at www.ca11.uscourts.gov

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Lois Tunstall, EE at (404) 335-6224.

Sincerely,

JOHN LEY, Clerk of Court

Reply to: Djuanna Clark
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs